UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-00873-JRS-TAB |
| | ) | |
| RICHARD E. WITKEMPER, | ) | |
| ELLEN F. WITKEMPER, | ) | |
| | ) | |
| Defendants. | ) | |

**Findings of Fact and Conclusions of Law**

This case came before the Court for a one-day bench trial on October 5, 2020. Plaintiff United States of America ("United States" or "Government") brought this action to reduce to judgment certain unpaid tax liabilities of Defendant Richard E. Witkemper ("Mr. Witkemper") (Count I); to enforce the federal tax liens on Mr. Witkemper's interest in certain real property (Count II); and to obtain a money judgment against Defendant Ellen F. Witkemper ("Mrs. Witkemper") (Count III), whom the Government alleges received the proceeds of the sale of certain real property to which the federal tax liens had attached and that Mr. Witkemper had caused to be fraudulently conveyed to her. Having heard and carefully considered the evidence, the Court enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1).

1

## I. Procedural Background

On March 16, 2018, the Government initiated this litigation against Defendants Mr. Witkemper; Mrs. Witkemper; Chad Witkemper, the son of Mr. And Mrs. Witkemper; and Pia O'Connor.  (Compl., ECF No. 1.)  The Government amended its Complaint on May 8, 2018. (Am. Compl., ECF No. 19.)  The Amended Complaint alleged that Mr. Witkemper failed, neglected, or refused to pay trust fund taxes in full and therefore owes the Government $385,705.54.[1]  (*Id.* ¶¶ 28–29.)  It further alleged that Mr. and Mrs. Witkemper purported to transfer their interest in their residential property, which was at the time subject to federal tax liens, to their children and that after several purported transfers of the residential property, those transfers were made subject to the federal tax liens or, in the alternative, that those transfers are void or voidable.  (*Id.* ¶¶ 30–46.)  Moreover, the Amended Complaint alleged that Mr. Witkemper fraudulently conveyed a parcel of real property, which was subject to federal tax liens, to Mrs. Witkemper and that the Government is therefore entitled to the proceeds she received from the sale of that real property.  (*Id.* ¶¶ 47–73.)

On May 22, 2018, Chad Witkemper answered the Government's Amended Complaint.  (Chad Witkemper Answer, ECF No. 21.)  On June 19, 2018, Mr. Witkemper and Mrs. Witkemper answered the Government's Amended Complaint, raising a statute of limitations affirmative defense.  (Witkemper Answer, ECF No. 26.)  As noted,

---

[1] This amount in fact differs from the total liability of $388,147.87 set forth in the Amended Complaint because, pursuant to stipulation, it reflects only Mr. Witkemper's trust fund recovery penalty ("TFRP") liabilities related to Maximum Spindle Utilization Inc., taking account of statutory accruals including penalties and interests, while excluding previously sought TFRP liabilities related to Maximum Engineering, Inc.  (Pl.'s Trial Br. n.1, ECF No. 73; *see also* Joint Stipulation ¶ 5, ECF No. 65; Murray Decl. ¶ 6, Trial Ex. 9.)

the parties filed a joint stipulation on August 19, 2020, in which the Government agreed to no longer seek a judgment against Mr. Witkemper for the TFRP liabilities assessed against him for the unpaid employment taxes of Maximum Engineering Inc. (Joint Stipulation ¶ 5, ECF No. 65.)  On August 20, 2020, the Court granted the Government's motion to voluntarily dismiss Defendants Chad Witkemper and Pia O'Connor, (Order, ECF No. 68), and a final pretrial conference was held between the remaining parties on September 16, 2020, (*see* Minute Order, ECF No. 95).

The Government was present at the October 5, 2020, bench trial via videoconference by counsel, Samuel Jones and Angela Foster.  Defendants Mr. Witkemper and Mrs. Witkemper were present in person and by counsel, Jason Smith and W. Brent Gill.  Mr. Witkemper and Mrs. Witkemper were the only witnesses called to testify. At the conclusion of trial, the Court took the matter under advisement and requested the filing of proposed findings of facts and conclusions of law from both parties.  This Order reflects and embodies the Court's final decisions on all pending issues of fact and law.  To the extent that any findings of fact are more properly construed as conclusions of law, or vice versa, they should be construed as such.

## II. Findings of Fact

### A. MAXIMUM SPINDLE UTILIZATION INC

1. Mr. Witkemper was the sole shareholder and president of Maximum Spindle Utilization Inc. ("Maximum Spindle"), a corporation based in Bartholomew County, Indiana.  (Stipulated Facts ¶ 1, ECF No. 82.)

2. Maximum Spindle was in the business of manufacturing, assembling, and testing a variety of diesel engine parts and machinery. (*Id.* ¶ 2.)

3. From 2004 through 2006, Maximum Spindle had employees. (*Id.* ¶ 3.)

4. Maximum Spindle, and Mr. Witkemper's other business, Maximum Engineering, Inc., were both located at 1141 South Walnut Street, Edinburgh, Indiana ("Commercial Property"), and 635 S. Mapleton Street, Columbus, Indiana ("S. Mapleton Property"). (Mr. Witkemper Aff. ¶ 3, Trial Ex. 3.)

5. As an employer, Maximum Spindle was subject to the federal employment tax obligations imposed by the Internal Revenue Code ("IRC"), including the duties to: (1) withhold from each employee's paycheck, and pay over to the United States, an estimated amount of income tax for each employee; (2) withhold from each employee's paycheck, and pay over to the United States, the employee portion of tax imposed upon wages by the Federal Insurance Contributions Act ("FICA"); and (3) pay the employer portion of the tax imposed upon employee wages by the FICA (collectively, "employment taxes"). (Stipulated Facts ¶ 4, ECF No. 82.)

6. During 2004, 2005, and 2006, Maximum Spindle failed to pay its employment taxes in full. (*Id.* ¶ 5.)

7. Mr. Witkemper was responsible for collecting, truthfully accounting for, and paying over to the United States the employment taxes withheld from the wages of employees of Maximum Spindle from 2004 through 2006. (*Id.* ¶ 6.)

4

8. Mr. Witkemper was the sole person responsible for making decisions to pay over Maximum Spindle's employment taxes from 2004 through 2006. (*Id.* ¶ 7.)

9. Mr. Witkemper paid other creditors, including employees, while the unpaid employment tax obligations of Maximum Spindle continued to accrue from 2005 through 2006. (*Id.* ¶ 8.)

10. In 2005, Mr. Witkemper began working with Internal Revenue Service ("IRS") Agent Nancy Archer, including meeting with her on September 8, 2005, after he was notified by the IRS of his tax delinquencies—via an IRS Notice of Tax Delinquency dated on or about August, 25, 2005 (*see* Trial Tr. 143:1-144:16, ECF No. 100; *see also* Trial Ex. 4 at 4 (referencing "Aug IRS Letter"); Trial Tr. 66:13-67:2, ECF No. 100.)—regarding Maximum Spindle. (Trial Tr. at 143:14–144:18, ECF No. 100; *see also* Trial Ex. 4.)

11. After the September 8, 2005 meeting, Mr. Witkemper attempted to work with Agent Archer, his former counsel, and other creditors to resolve the issues. (Trial Tr. at 145:11–15, ECF No. 100.)

12. However, on January 30, 2007, Maximum Spindle sought protection from its creditors, including IRS, by filing a petition for relief under Chapter 11 of the Bankruptcy Code. (Stipulated Facts ¶ 9, ECF No. 82.)

13. Maximum Spindle was not able to present a successful plan of reorganization and the Bankruptcy Court dismissed the case on April 4, 2008. (*Id.* ¶ 10.)

14. The IRS was not able to collect in full the unpaid employment taxes during Maximum Spindle's bankruptcy case. (*Id.* ¶ 11.)

15. Maximum Spindle is no longer in operation.  (*Id.* ¶ 12.)

B. TRUST FUND RECOVERY PENALTY

16. On March 1, 2007, Archer sent Mr. Witkemper an 1153 letter informing him that to collect the outstanding federal employment taxes due from MSU the IRS proposed "to assess a penalty against you as a person required to collect, account for, and pay over withheld taxes for the above business." (Trial Ex. 42 at 6.)  The letter noted that, under section 6672, "[t]he penalty we propose to assess against you is a personal liability called the Trust Fund Recovery Penalty."  (*Id.*)  Detailed instructions on how to appeal or protest the action, including the requirement to "mail us your written appeal within 60 days from the date of this letter" where provided.  (*Id.*)  Rather than mailing a written protest to the IRS as instructed, Mr. Witkemper, via counsel, faxed a "Formal Protest and Appeal of Proposed Assessment of Civil Penalties" to Archer at an unknown fax number.  (*Id.* at 2-10.)  No fax confirmation sheet is provided, nor is any indication that the fax was ever received by the IRS, entered into the Certificate of Assessments, Payments, and Other Specified Matters transcripts (*see, e.g.,* Trial Ex. 8), or otherwise acknowledged, processed or acted upon by the IRS.  The transcripts do detail Collection Due Process (CDP) matters including timely request for hearing, issuances of notice determination, levy notice, and notice of lien filed.  (Trial Ex. 8 at 2-3; *see* Trial Ex. 52; *see also* Trial Ex. 53.)  On February 18, 2008, a delegate for the Secretary of the Treasury ("Secretary") made TFRP assessments against Mr. Witkemper for the trust

6

fund portion of the unpaid employment taxes of Maximum Spindle.  (Form 4340, Trial Ex. 8 at 3, 18, 24, 29, 33.)

17. That is, the portion of the unpaid employment taxes representing the employees' share of employment taxes and income taxes withheld from employees' wages.

18. The TFRP assessments were for the tax periods ending on June 30, 2005; December 31, 2005; March 31, 2006; June 30, 2006; and September 30, 2006.  (*Id.*; *see* Report of Business's Unpaid Tax Liability, Trial Ex. 42 at 11; Trial Ex. 11 at 20.)  The IRS sent statutory notice of the balances due and demand for payment to Mr. Witkemper on February 18, 2008.  (Form 4340, Trial Ex. 8 at 13, 20, 26, 30, 34.)

19. The TFRP liabilities for each of these periods remain unpaid.  (Murray Decl. ¶ 6, Trial Ex. 9.)

20. As of August 24, 2020, Mr. Witkemper's TFRP liabilities for Maximum Spindle total $385,705.54.  (*Id.*)

C. THE OFFER-IN-COMPROMISE

21. On August 5, 2008, the IRS processed an "Offer in Compromise" Form 656, from Mr. Witkemper.  (Form 656, Trial Ex. 11 at 1–5; Trial Ex. 8 at 4, 19, 25, 29, 33.)

22. The form indicated, as is evident by Mr. Witkemper checking the TFRP box, that Mr. Witkemper submitted this offer-in-compromise ("OIC") for a "Trust

Fund Recovery Penalty as a responsible person of . . . 'Maximum Spindle Uti-

lization' for failure to pay withholding and Federal Insurance Contributions

Act Taxes . . . for period(s) ending '6/30/05, 12/31/05, 3/31/05 [sic], 9/30/06[.]'"

(Form 656, Trial Ex. 11 at 1.)

23. On the form, Mr. Witkemper also checked the "Deferred Periodic Payment Of-

fer" box, indicating that he would pay $500.00 a month, for six months, begin-

ning on August 15, 2008. (*Id.* at 2.)  In his own handwriting, he then wrote

that after the first six months, he would pay "$2,000/mo[nth] each month until

$100,000 is reached." (*Id.*)

24. Mr. Witkemper signed[2] the OIC Form 656 on July 10, 2008. (*Id.* at 4.) Section

V(e) of Form 656 included a waiver and agreement "to the suspension of any

---

[2] Contentions arose at trial over signatures in this case.  Mr. Witkemper testified that he did not submit an OIC to the IRS.  (*See, e.g.*, Trial Tr. at 184:13–15, 192:6–11, ECF No. 100; *cf.* Trial Ex. 13 at 2.)  He also testified that the signature on the Form 656, (Trial Ex. 11 at 4), was not his.  Indeed, throughout the trial, Mr. Witkemper often testified that he did not sign documents or did not recall signing documents.  However, he did admit to signing a few documents, (*e.g.*, Trial Ex. 11 at 13; Trial Ex. 42 at 5).  (*See* Trial Tr. at 184:13–15, 192:6–11, ECF No. 100.)  The Court extensively reviewed the evidence—both during and after the trial—in this case, including all of Mr. Witkemper's "signatures" in this case, and the Court finds that Mr. Witkemper's signature on the Form 656, (Trial Ex. 11 at 4), so closely resembles the signatures Mr. Witkemper acknowledged to be his on other documents that Mr. Witkemper did indeed sign the Form 656 on July 10, 2008.  As is not uncommon, he signs his name in different ways at different times, but with consistency and fidelity apparent to the Court.  For example, the disputed signature on page 4 of Trial Exhibit 11 appears to be a hasty signature that is substantially similar to the signature on a document withdrawing his OIC "submitted on 08/29/2008 in the amount of $100,000.00" at page 22 of Trial Exhibit 11, and on page 5 of Trial Exhibit 42, which is also signed by his attorney, and on several notarized documents filed with the Indiana Department of Revenue (Trial Ex. 18 at 6, 7), and twice on a document filed with the Indiana Department of State (Trial Ex. 18 at 1, 3), and to notarized signatures on a mortgage (Trial Ex. 20 at 5), an agreement (Trial Ex. 21 at 5, 6, 7, 8), a bank account agreement (Trial Ex. 22 at 3, 4), a Lease Agreement (Trial Ex. 23 at 17), and a multitude of bank checks (e.g., Trial Ex. 24 at 7–8), and many other legal documents both notarized—with the self-authentication guarantees and the strictures on the notary that notarization entails—and not.  In contrast, the more formal, "payroll signature" on page 14

8

statutory periods of limitation . . . for the IRS assessment of the liability." (*Id.* at 2, 4.)

25. On July 25, 2008, Mr. Witkemper filled out a "Collection Information Statement of Wage Earners and Self-Employed Individuals" Form 433-A. (Form 433-A, Trial Ex. 11 at 6–11.)

26. An Authorized IRS Official signed[3] the OIC Form 656 on August 5, 2008, below the line that stated "I accept the waiver of the statutory period of limitations on assessment for the Internal Revenue Service, as described in Section V(e)." (Form 656, Trial Ex. 11 at 4.)

27. The IRS received a payment of $150, the application fee for submitting such offer at the time, (Trial Ex. 10 at 4), from Mr. Witkemper the day before he submitted his OIC. (Trial Ex. 8 at 4.)

28. The IRS also received a cash payment of $500.00 from Mr. Witkemper the day before he submitted his OIC. (*Id.*) At the time, a 20% lump sum cash payment

---

of Trial Exhibit 11 on a written letter (agreeing to "continue to send the $500/mon as indicated in my last letter") from Mr. Witkemper to Mrs. Cohen, in response to an IRS letter directing him to contact her (Trial Ex. 11 at 12) concerning the OIC, is similar to his other more formal, less hasty signatures such as found on notarized quitclaim deeds (Trial Ex. 16 at 1, 12). The Court credits each of these types of signatures to Mr. Witkemper, and discredits argument or testimony to the contrary, and thus the admitted documents relied upon herein.
[3] During trial, Mr. Witkemper's counsel objected to the admission of Exhibit 11 because page four of Mr. Witkemper's Form 656, which contained the IRS official's signature, was originally omitted before trial until Mr. Witkemper's counsel notified the Government of such omission. (*See* Trial Tr. 31:17–37:21, ECF No. 100.) Once notified, however, the Government timely provided the complete Form 656, which included the unintentionally omitted page four. The Court admitted Exhibit 11 into evidence. (*Id.* at 186:5.) Near the close of trial, Mr. Witkemper's counsel again brought up Trial Exhibit 11, essentially claiming that page four had been doctored in some way or that the IRS official's signature had been forged. (*See id.* at 210:2–220:7.) Considering counsels' arguments and examining the evidence in this case, the Court finds these arguments unavailing.

offer or the first installment payment of a periodic payment offer was due. (Trial Ex. 10 at 4.)  This $500 payment would be consistent with the first payment of his OIC to pay $500/month.

29. On August 12, 2008, the IRS sent Mr. Witkemper a letter informing him that it had received his OIC, but that the IRS required him to correct his Form 656 and attach additional documentation before it could complete its evaluation, and noting that the person to contact at the IRS was Mrs. E. Cohen.  (Aug. 10, 2008, IRS Letter, Trial Ex. 11 at 12–13.)

30. On September 15, 2008, the IRS received from Mr. Witkemper an amended Form 656, signed August 29, 2008.  (Amended OIC Form 656, Trial Ex. 11 at 15–18.)

31. The amended form was sent under cover of a signed, hand-written letter from Mr. Witkemper, addressed to Cohen, his contact person at the IRS, stating that "I have worked for several days to pull together the information requested.  I hope I have met your requirements," "I will do whatever it takes to comply with your requests," and "I will continue to send the $500/mon. as indicated in my last letter."  (Mr. Witkemper Letter to Cohen, Trial Ex. 11 at 14.)

32. On February 10, 2009, the IRS sent Mr. Witkemper a letter notifying him that, per Mr. Witkemper's request of even date, the IRS had prepared a withdrawal request for him to sign.  (Trial Ex. 11 at 19–20.)

33. Mr. Witkemper signed the withdrawal request, dated February 17, 2009, and it was marked received on February 23, 2009.  On February 26, 2009, Mr. Witkemper's OIC was officially withdrawn.  (IRS Withdrawal Letter, Trial Ex. 11 at 21–22; *see also* Trial Ex. 45 at 8, 12, 17, 25, 31; Trial Ex. 53 at 2, 4, 7, 9.)  On March 16, 2009, the IRS then sent Mr. Witkemper a statutory notice of intent to levy his property.  (Trial Ex. 8 at 14, 20, 26, 30, 34.)

### D. THE RESIDENTIAL PROPERTY

34. In 1984, Mr. Witkemper and Mrs. Witkemper acquired a parcel of real property, commonly known as 4532 29th Street, Columbus, Indiana 47203 ("Residential Property"), as tenants by the entirety, by warranty deed dated September 28, 1984, and recorded on October 1, 1984, with the Bartholomew County, Indiana, Recorder ("Bartholomew Recorder").  (Stipulated Facts ¶ 13, ECF No. 82.)

35. On March 12, 2008, the IRS recorded a Notice of Federal Tax Lien ("NFTL") against Mr. Witkemper, listing the unpaid TFRP liability in the amount of $69,494.44, associated with Maximum Spindle for the second quarter of 2006, with the Bartholomew Recorder.  (*Id.* ¶ 14; *see also* Trial Ex. 8 at 29; Trial Ex. 15 at 1, 4 (various Notice of Federal Tax Lien forms 668).)

36. On July 28, 2008, the IRS recorded an NFTL against Mr. Witkemper, listing the unpaid TFRP liabilities in the total amount of $203,263.56 associated with Maximum Spindle for the second quarter of 2005, the fourth quarter of 2005,

11

the first quarter of 2006, and the third quarter of 2006, with the Bartholomew

Recorder. (Stipulated Facts ¶ 15, ECF No. 82.)

37. After the IRS recorded its NFTLs against Mr. Witkemper, Mr. and Mrs. Wit-
kemper, as husband and wife, purported to transfer their interest in the Resi-
dential Property—for no consideration—to their children Chad Witkemper and
Stephanie Witkemper Sester, as tenants in common, subject to a life estate
reserved for the lives of Mr. and Mrs. Witkemper, as grantors, by quitclaim
deed dated April 16, 2014, and recorded on April 16, 2014, with the Bartholo-
mew Recorder. (*Id.* ¶ 16.)

38. On July 8, 2016, Stephanie Witkemper Sester died intestate in the State of
Arizona. (Stipulated Facts ¶ 17.)

39. Stephanie Witkemper Sester's purported undivided half interest in the Resi-
dential property passed, via Affidavit for Transfer of Real Estate, dated No-
vember 30, 2016 and recorded on January 17, 2017, with the Bartholomew Re-
corder, as follows: half to her husband, Michael Ryan Sester, and a quarter
each to her parents, Mr. and Mrs. Witkemper. (Sester Aff. for Transfer of Real
Estate ¶ 10, Trial Ex. 16 at 3-7.)

40. By quitclaim deed dated November 9, 2016, and recorded with the Bartholo-
mew Recorder on January 17, 2017, Mrs. Witkemper purported to transfer her
inherited interest of one-fourth of a one-half undivided interest (one-eighth in-
terest) in the Residential Property to Chad Witkemper for no consideration.
(Quitclaim Deed, Trial Ex. 16 at 8–9.)

41. By quitclaim deed dated November 9, 2016, and recorded with the Bartholo-
    mew Recorder on January 17, 2017,  Mr. Witkemper purported to transfer his
    inherited interest of one-fourth of a one-half interest undivided interest (one-
    eighth interest) in the Residential Property to Chad Witkemper for no consid-
    eration.  (*Id.* at 12–13.)

42. By quitclaim deed dated November 30, 2016, and recorded with the Bartholo-
    mew Recorder on January 17, 2017, Michael Ryan Sester purported to transfer
    his inherited one-half of an undivided one-half interest (one-fourth interest) in
    the Residential Property to Chad Witkemper for no consideration.  (Stipulated
    Facts ¶ 18, ECF No. 82.)

43. Chad Witkemper was thus listed as the record owner of the Residential Prop-
    erty with the Bartholomew Recorder, and may have claimed an interest in the
    Residential Property pursuant to 26 U.S.C. § 7403(b).  (Joint Stipulation ¶ 7,
    ECF No 65.)

44. By quitclaim deed dated August 12, 2020, and recorded with the Bartholomew
    Recorder on August 13, 2020, Chad Witkemper transferred his entire interest
    in the Residential Property to Mr. and Mrs. Witkemper, as joint tenants with
    the right of survivorship, for no consideration.  (Quit-Claim Deed, Trial Ex. 16
    at 14–16.)

45. Chad Witkemper has no right, claim, lien, or other interest in the Residential
    Property.  (Stipulated Facts ¶ 19, ECF No. 82.)

46. Legal title to the Residential Property is held solely by Mr. and Mrs. Witkemper.  (*Id.* ¶ 20.)

47. At all times since Mr. and Mrs. Witkemper acquired the Residential Property in 1984, they have resided in the Residential Property as their primary residence and have been responsible for all maintenance, upkeep, property taxes, liability insurance, and other expenses associated with the Residential Property.  (*Id.* ¶ 21.)

### E. WITKEMPER PROPERTIES LLC

48. On or about December 15, 2005, Mr. Witkemper created a for-profit business entity known as Witkemper Properties LLC ("Witkemper Properties") by filing Articles of Organization with the Indiana Secretary of State.  (*Id.* ¶ 22.)

49. The sole business activity of Witkemper Properties was to lease commercial properties to commercial tenants.  (*Id.* ¶ 23.)

50. Mr. Witkemper was at all times the sole member and sole manager of Witkemper Properties.  (*Id.* ¶ 24.)

51. Mr. Witkemper was the only person who handled accounting or financial services for Witkemper Properties from the time it was created through and including December 31, 2013.  (Trial Tr. at 75:12–15, ECF No. 100.)

52. Mr. Witkemper was responsible for keeping the business records for Witkemper Properties, which did not amount to much other than the Articles of Organization filed with the Indiana Secretary of State.  (*Id.* at 75:16–76:11.)

53. Mrs. Witkemper was not a member of Witkemper Properties.   (Stipulated Facts ¶ 25, ECF No. 82.)

54. Mrs. Witkemper professed little knowledge or active involvement in the business or management of Witkemper Properties; nor was she a creditor of that business.  (Trial Tr. at 156:13–157:25, ECF No. 100; Answer ¶ 51, ECF No. 26.)

55. Mr. Witkemper knew that Witkemper Properties was required to file business entity reports with the Secretary of State every two years, but Witkemper Properties did not file a business entity report in 2007.  (Trial Tr. at 82:2–83:17; Trial Ex. 18 at 1–3.)

56. On July 7, 2009, the Indiana Secretary of State administratively dissolved Witkemper Properties for failure to file its first business entity report with the Indiana Secretary of State.  (Notice of Administrative Dissolution, Trial Ex. 17; *see also* Answer ¶ 59, ECF No. 26.)

57. Mr. Witkemper requested reinstatement for Witkemper Properties by submitting a notarized Affidavit for Reinstatement of Domestic Corporation to the Indiana Department of Revenue ("IDR").  (Aff. for Reinstatement of Domestic Corp., Trial Ex. 18 at 6.)

58. On November 17, 2009, the IDR responded and noted that it had no record of the Federal Identification Number Mr. Witkemper provided for Witkemper Properties, nor did it have any Indiana Corporate Income Tax returns on file for the LLC.  (IDR Letter to Witkemper Properties, Trial Ex. 18 at 8.)

59. The IDR also requested that Mr. Witkemper provide a copy of the letter from the IRS showing Witkemper Properties's name, the date of approval, and the Federal Identification Number assigned to the LLC.  (*Id.*)

60. On December 21, 2009, the IDR rejected Mr. Witkemper's reinstatement request for Witkemper Properties because it did not receive from Mr. Witkemper the previously "requested additional documentation, tax returns and/or payment . . . ."  (Denial of Request for Reinstatement, Trial Ex. 18 at 9.)

61. Mr. Witkemper did not change how he operated Witkemper Properties after its dissolution.  (Trial Tr. at 85:21–86:4, ECF No. 100.)

## F. THE PROPERTIES

62. In 2006, Witkemper Properties purchased the S. Mapleton Property by taking out a $453,019 loan from GE Capital Corporation and a $373,000 loan from Premier Capital Corporation.  (*See id.* at 89:8–92:14; *see also* Trial Ex. 29 at 11–39; Premier Capital Mortgage, Trial Ex. 30.)

63. Both loans were secured by mortgages, and Mr. Witkemper was the guarantor for both loans.  (Trial Tr. at 91:3, 92:17, ECF No. 100; *see* Trial Ex. 29; Trial Ex. 30.)

64. Witkemper Properties acquired the Commercial Property from WLS Properties, LLC by warranty deed dated June 1, 2006, and recorded on June 5, 2006, with the Bartholomew Recorder.  (Answer ¶ 52, ECF No. 26; *see also* Trial Tr. at 94:16–22, ECF No. 100.)  Mr. Witkemper created WLS Properties, LLC in 1999 by filing articles of organization with the Indiana Secretary of State.  (Answer ¶ 53,

16

ECF No. 26.)  WLS was administratively dissolved by the Indiana Secretary of State in 2004.  (*Id.*)

65. To purchase the Commercial Property, Witkemper Properties took out a loan in the amount of $578,250.00 from Sterling Bank.  Sterling Bank secured the loan with a mortgage on the Commercial Property, which was filed with the Bartholomew Recorder on June 5, 2006.  (Mortgage Agreement, Trial Ex. 20; *see also* Trial Tr. at 96:25–97:9, ECF No. 100.)

66. Mr. Witkemper was the guarantor on the Sterling Bank loan.  (Trial Tr. at 97:8–9, ECF No. 100.)

67. The S. Mapleton Property and the Commercial Property were the only assets of Witkemper Properties.  (*Id.* at 97:11–15.)

68. Witkemper Properties leased both properties to commercial tenants, and the rental income from those commercial tenants was Witkemper Properties's only source of revenue.  (*Id.* at 97:16–21.)  The Commercial Property was leased to The Phillips Company from September 2007 until the Commercial Property was sold in March 2014.  (Trial Tr. at 113:3–6, ECF No. 100.)

69. Mr. Witkemper at all times exercised dominion and control over the Commercial Property.  (Answer ¶ 54, ECF No. 26.)

70. On September 5, 2007, Mr. Witkemper opened a bank account for Witkemper Properties (the "Account") with First Financial Bank N.A. in Columbus, Indiana.  (Account Agreement, Trial Ex. 22; *see also* Trial Tr. 98:5–99:15, ECF No. 100.)

71. Mr. Witkemper had signatory authority and control over the Account.  (Trial Tr. 99:12–13, ECF No. 100.)

72. Mrs. Witkemper also had signatory authority over the account.  (*Id.* at 157:4–6.)

73. Mr. Witkemper made all deposits and signed all checks from the Account.  (*Id.* at 99:14–19.)

74. Mr. Witkemper deposited monthly rent checks from tenants of Witkemper Properties into the Account.  (*Id.* at 100:25–101:3.)

75. From 2009 to 2014, Mr. Witkemper did not have a personal bank account; instead, he used the Account as his personal bank account.  (*Id.* at 102:15–22; *see also* Form 433-A, Box 13a, Trial Ex. 33 (listing "No Account" under "Type of Account").)  He did not distinguish whether any use was personal use or for a business expense for Witkemper Properties.  (Trial Tr. at 105:16-23, Ex. 100.)

76. From February 2012 through May 2014, Mr. Witkemper frequently utilized the Account funds for personal expenditures, unrelated to leasing commercial properties.  (*E.g.*, Trial Ex. 24 at 70.)

77. Mr. Witkemper also deposited personal checks into the Account from 2007 to 2014.  (Trial Tr. 110:6–14, ECF No. 100.)

78. During the 2009 to 2013 tax years, Mr. and Mrs. Witkemper reported the rental income and expenses from both the S. Mapleton Property and the Commercial Property on the "Schedule E – Supplemental Income and Loss" of their

joint Form 1040 Federal Income Tax Returns.  (2009 to 2013 Form 1040s, Trial Ex. 26 at 4, 28, 48, 56, 64.)

### G. THE TRANSFER OF THE COMMERCIAL PROPERTY

79. A subsequent "Tax Advance Agreement" among Witkemper Properties, Mr. and Mrs. Witkemper, Maximum Engineering Inc., Maximum Spindle, and Sterling Bank dated January 13, 2010, and filed with the Bartholomew Recorder on June 1, 2010, noted that Witkemper Properties had failed to pay property taxes in the amount of $23,241.91 related to the Commercial Property for the 2008 tax year.  (Tax Advance Agreement, Trial Ex. 21; *see also* Trial Tr. 112:2–13, ECF No. 100.)  Mr. Witkemper acknowledged this failure.  (Trial Tr. at 110:22–24.)

80. On August 8, 2012, A&B Investments ("A&B") instituted legal action in the Bartholomew County, Indiana, Circuit Court against Witkemper Properties and Mr. Witkemper, seeking a judgment against both and a decree of foreclosure on the S. Mapleton Property.  (*Id* at 114:17–26; A&B Compl., Trial Ex. 29 at 1–10.)

81. By quitclaim deed dated January 21, 2013, and recorded with the Bartholomew Recorder on January 22, 2013, Mr. Witkemper caused Witkemper Properties to transfer its interest in the Commercial Property to Mrs. Witkemper for no consideration.  (Stipulated Facts ¶ 26, ECF No. 82.)

82. Mr. Witkemper executed a corrective quitclaim deed on February 25, 2013, and recorded it with the Bartholomew Recorder on February 27, 2013, to correct

the legal description contained in the aforementioned quitclaim deed dated January 21, 2013.  (*Id.* ¶ 27.)

83. Before the transfer, as early as 2009, Mrs. Witkemper became aware of Mr. Witkemper's federal tax liabilities.  (Trial Tr. at 158: 9–11, ECF No. 100.)

84. At the time of the transfer, Mr. Witkemper had accrued in excess of $272,858 in TFRP liabilities for the unpaid employment taxes of Maximum Spindle and his remaining liabilities (e.g., the Sterling Bank mortgage, the Premier Capital mortgage, the A&B foreclosure action, etc.).  However, his remaining assets such as the Residential Property valued at $150,200.00 (assessed value at the time of transfer, (Stipulated Facts ¶ 28, ECF No. 82), but Mr. Witkemper having a half interest of about $73,100 subject to the mortgage (Trial Tr. 131:1–6, ECF No. 100)), his personal assets, social security benefits, and life insurance policy did not exceed his TFRP liabilities.  (*See* NFTL, Ex. 15; A&B Compl., Trial Ex. 29 at 1–10; Stipulated Facts ¶ 28, ECF No. 82; Trial Tr. at 129:11–131:22, ECF No. 100.)

85. On March 27, 2013, the Bartholomew circuit court entered a judgment and decree of foreclosure in favor of A&B and against Witkemper Properties and Mr. Witkemper, jointly and severally, in the amount of $452,086.90, plus accrued interest in the amount of $70,280.25 as of December 1, 2012, and the amount of $52,684.47 for the redemption of real property taxes.  (Judgment and Decree, Trial Ex. 29 at 50–55; Trial Tr. at 117:2–15, ECF No. 100.)

86. The S. Mapleton Property was also still encumbered by the Premier Capital mortgage when the court entered judgment against Witkemper Properties and Mr. Witkemper. (Trial Tr. at 117:16–19, ECF No. 100.)

87. In August 2013, the S. Mapleton Property was sold to an entity named Cyber-metrix Inc. (*Id.* at 118:3–9.)

88. Neither Mr. Witkemper nor Witkemper Properties received any proceeds from the sale of the S. Mapleton Property. (*Id.* at 117:25–118:13; Trial Ex. 34 at 7.)

89. On or about March 28, 2014, the Commercial Property was sold to an entity named Blair Holdings LLC for a total sale price of $805,000.00. (Stipulated Facts ¶ 29, ECF No. 82.)

90. The net proceeds from the sale were $202,931.01. (*Id.* ¶ 30.)

91. Mr. and Mrs. Witkemper reported the net proceeds of $202,931.01 from the sale of the Commercial Property on "Schedule D – Capital Gains and Losses" on their joint Form 1040 Federal Income Tax Return for the 2014 tax year. (*Id.* ¶ 31.)

92. Pursuant to the sale, Mrs. Witkemper's title interest in the Commercial Property was transferred to Blair Holdings LLC by warranty deed dated March 28, 2014, and recorded with the Bartholomew Recorder on April 4, 2014. (*Id.* ¶ 32.)

93. On or about March 29, 2014, Mrs. Witkemper deposited the $202,931.01 in sales proceeds into a checking account at the Centra Credit Union ("Centra Checking Account"). Prior to this deposit, the balance for the Centra Checking

Account was $52,384.67.  (*Id.* ¶ 33; *see also* Centra Checking Account Statement at 1, Trial Ex. 38.)

94. Mrs. Witkemper utilized the Centra Checking Account to pay all household bills, such as the mortgage for the Residential Property and utilities; and to write at least one personal check to Mr. Witkemper.  (Trial Tr. at 161:13–162:16, ECF No. 100; Trial Ex. 24 at 238 ($4,500 check to Mr. Witkemper).)

95. On or about May 8, 2014, Mrs. Witkemper withdrew $135,000.00 from the Centra Credit Union checking account and deposited it into an investment account with J.J.B. Hilliard, W.I. Lyons, LLC ("Investment Account").  (Stipulated Facts ¶ 34, ECF No. 82.)   This account was in her name.  (Trial Ex. 39.)

96. From 2014 to 2019, Mrs. Witkemper withdrew money from the Investment Account to pay for the joint expenditures of her and Mr. Witkemper.  (Trial Tr. at 163:8–166:23, ECF No. 100; *see also* Trial Ex. 39 at 14, 45, 57.)

97. As of July 2019, $77,013.07 remained in the Investment Account.  (Trial Tr. at 163:21–24, ECF No. 100; Trial Ex. 39 at 62.)

## III. Conclusions of Law

1. The Court has jurisdiction pursuant to 26 U.S.C. §§ 7402, 7403, and 28 U.S.C. §§ 1331, 1340, 1345.

### A. TRUST FUND RECOVERY PENALTY LIABILITIES

2. The IRC requires employers to withhold income, Medicare and Social Security taxes from the wages of their employees.  26 U.S.C. §§ 3102(a), 3402(a).

3.  Those withholdings must be held in trust for the benefit of the United States. *Id.* § 7501.

4.  Congress enacted 26 U.S.C § 6672 "to protect against employers' squandering this trust fund." *Thomas v. United States*, 41 F.3d 1109, 1113 (7th Cir. 1994).

5.  "Employers must report and pay the taxes they withhold quarterly." *Id.*

6.  "The Supreme Court has interpreted [§ 6672] to impose liability on any person who fails to perform his duty to collect, account for, or pay over the withholding taxes." *Id.* (citing *Slodov v. United States*, 436 U.S. 238, 247, 250 (1978)). A person who shall "be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over." 26 U.S.C § 6672(a). The person (i.e., the taxpayer) must be notified in writing or in person "that the taxpayer shall be subject to an assessment of such penalty." *Id.* § 6672(b)(1). This notice "shall precede any notice of any penalty . . . by at least 60 days." *Id.* § 6672(b)(2). "[T]he amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) . . . and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period." *Id.* § 6501(a). However, if the notice of the penalty is mailed before the expiration of that period, and a timely protest of the proposed assessment is made, then "that period shall not expire before . . . the date 30 days after the Secretary makes a final administrative determination with respect to such [timely filed] protest." *Id.* § 6672(b)(3). But, "[i]n case of a willful

attempt in any manner to defeat or evade tax imposed by this title (other than tax imposed by subtitle A [income taxes] or B [estate taxes]), the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time." *Id.* § 6501(c)(2). Where a timely assessment has been made, "such tax may be collected by levy or by a proceeding in court" if instituted "within 10 years after the assessment of the tax." *Id.* § 6502(a).

7. Section 6672 penalty liability is separate and distinct from the employer's liability for trust fund taxes, and the IRS is not required to first attempt to collect the withheld taxes from the employer. *See Gessert v. United States*, 703 F.3d 1028, 1031 (7th Cir. 2013) ("The trust fund recovery penalty liability is separate and distinct from the firm's liability—i.e., the responsible person cannot recover from the firm and the IRS can recover from the person individually.") (internal citations omitted).

8. To be personally liable, an individual must be (1) a "responsible person" who (2) has "willfully" failed to collect, account for, or pay over payroll taxes to the United States. *Jefferson v. United States,* 546 F.3d 477, 480 (7th Cir. 2008).

9. "[T]he Commissioner's tax deficiency determinations are presumed correct." *United States v. Running*, 7 F.3d 1293, 1297 (7th Cir. 1993) (noting the taxpayer bears the burden to show lack of responsibility or willfulness).

10. "Once the government has assessed a taxpayer for the nonpayment of taxes under [§] 6672, the taxpayer bears the burdens of production and persuasion to disprove his status as a responsible person who willfully failed to collect,

account for, or pay over the taxes." *Thomas*, 41 F.3d at 1113 (citing *Ruth v. United States,* 823 F.2d 1091 (7th Cir. 1987)).  The taxpayer must carry its burden by a preponderance of the evidence. *See, e.g.*, *Byrne v. United States,* 857 F.3d 319, 327 (6th Cir. 2017)

11.  "In general, courts will not look behind an assessment to evaluate the procedure and evidence used in making the assessment." *Ruth*, 823 F.2d at 1094.

12.  Form 4340 Certificates of Assessments, Payments, and Other Specified Matters (*see, e.g.,* Trial Ex. 8), provide *prima facie* evidence of the validity and correctness of federal tax assessments and events listed in those documents. *Hefti v. IRS*, 8 F.3d 1169, 1174 (7th Cir. 1993) ("Certificates of Assessments and Payments provide a sufficient basis for establishing that the assessments at issue were duly made without requiring discovery of the underlying source documents.").

13.  Mr. Witkemper has asserted that because the Government's certified IRS 4340 Certificates of Assessments, Payments, and Other Specified Matters transcripts contain conflicting and unreliable information, for example asking the Court to *compare* Trial Ex. 8, *with* Trial Ex. 53, that is evidence that he never received a final determination on his April 2007 protest.  However, after conducting its *de novo* review of the evidence and correctness of the assessment, *see Ruth*, 823 F.2d at 1094, the Court finds that he has not rebutted the presumption of correctness afforded to the Commissioner's tax deficiency determinations.  Indeed, he has failed to show that the assessment is "'without rational

25

foundation' or 'arbitrary and erroneous' . . . ." *Id.* In fact, here he does not directly dispute the tax deficiency itself or even the finding of liability—where the question is whether Mr. Witkemper was a "responsible person" and whether he "willfully violated section 6672 duties. *Id.*

    *1. The IRS Did Not Err by Failing to Issue a Pre-Assessment Decision*

14.  The Witkempers also procedurally attack the assessment as invalid because the IRS did not respond to their protest. They rely chiefly on an Eleventh Circuit case that does not bind the Court. *See Romano-Murphy v. Comm'r*, 816 F.3d 707, 721 (11th Cir. 2016) (holding that "a taxpayer is entitled to a pre-assessment administrative determination by the IRS of her proposed liability for trust fund taxes if she files a timely protest").

15.  In *Romano-Murphy*, the Eleventh Circuit examined 26 U.S.C. § 6672(b), associated regulations, and relevant parts of the IRS's manual and procedures, ultimately holding that it was erroneous for the IRS not to provide the taxpayer with a pre-assessment determination of her liability under § 6672 before making the assessment. 816 F.3d at 714. The *Romano-Murphy* panel remanded to the tax court to determine whether the error was harmless. *Id.* at 719–22.

16.  The Witkempers cite no Seventh Circuit authority. Rather, previous language from the Seventh Circuit, in the context of a taxpayer challenging the amount of an assessment under § 6672 by attacking the procedure the IRS used in determining the amount of the assessment, seems to suggest that the Seventh Circuit would not rule the same way as the Eleventh Circuit on the question of

26

whether a pre-assessment administrative determination must issue before an assessment issues. *See Ruth*, 823 F.2d at 1094 ("As long as the procedures used and the evidence relied upon by the government to determine the assessment had a rational foundation, *the inquiry focuses on the merits of the tax liability, not on IRS procedures.*" (emphasis added)).

17. Even if this Court were to follow *Romano-Murphy*, the record does not clearly reflect that the IRS received any protest from the Witkempers pursuant to established IRS procedures for filing such a protest. While then-counsel for the Witkempers faxed a protest to the IRS, (Trial Ex. 42 at 2–5), the Internal Revenue Manual, *see* IRM § 8.25.1.5.2(2), and the Letter 1153, (Trial Ex. 42 at 6), require the protest to be "mailed" to a specific address, not faxed. Nothing in the IRS's presumptively correct documents reflects that the IRS received this improperly-filed protest. (*See generally* Trial Ex. 8.)

18. Even if there were evidence that the IRS received a timely protest, and even if the Witkempers were legally entitled to a pre-assessment administrative determination by the IRS of their proposed liability for trust fund taxes before any assessment issued, the Witkempers have said nothing about how the lack of a pre-assessment administrative determination has harmed them. *See, e.g., Dodson v. Nat'l Transp. Safety Bd.*, 644 F.2d 647, 652 (7th Cir. 1981) ("It is settled that agency action will not be upset in the event of a harmless procedural error."); *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("But administrative error may be harmless: we will not remand a case to the [agency]

for further specification where we are convinced that the [agency] will reach the same result."). There is simply no indication that the amount of the assessment was incorrect or that the IRS Appeals Office would have reached a different decision had it issued a pre-assessment administrative determination. In fact, Mr. Witkemper has here attacked only procedural rather than substantive aspects of the process or complained about his inability to satisfy the assessment. (*See, e.g.*, Trial Ex. 11 at 3.)

19. The IRS did not need to provide the Witkempers with a pre-assessment administrative response or determination before issuing an assessment for trust fund tax liability. Thus, the IRS did not err by failing to give the Witkempers a pre-assessment administrative determination of proposed liability.

20. Even if the IRS had to do so and erred, such error was harmless.

   *2. Mr. Witkemper Was a § 6672 "Responsible Person" at Maximum Spindle*

21. The Parties seem to agree that Mr. Witkemper was a "responsible person" for purposes of "the federal employment tax obligations owed by MSU." (Defendats' FFCL ¶ 3; ECF No. 104; *see* Plaintiff's FFCL ¶¶ 10-14, ECF No. 103.) The Court agrees based on its own analysis. A person is a "responsible person" under § 6672 if "'he retains sufficient control of corporate finances that he can allocate corporate funds to pay the corporation's other debts in preference to the corporation's withholding tax obligations.'" *Jefferson,* 546 F.3d at 480 (quoting *Bowlen v. United States*, 956 F.2d 723, 728 (7th Cir. 1992)).

28

22. "[A] person need not necessarily have 'exclusive control over the disbursal of funds or have the final word as to which creditors should be paid so long as he has significant control' because 'the key to liability under [§] 6672 is the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations.'" *Id.* (quoting *Bowlen*, 956 F.2d at 728).

23. Indeed, "[c]ourts have recognized several indicia of responsible person status including ownership of stock or holding of an entrepreneurial stake in a corporation and authority to sign checks on corporate accounts or prevent their issuance by denying a necessary signature." *Bowlen*, 956 F.2d at 728 (citing *Monday v. United States*, 421 F.2d 1210, 1214–15 (7th Cir. 1970)).

24. Mr. Witkemper was the sole shareholder and president of Maximum Spindle; he was responsible for collecting, truthfully accounting for, and paying over to the Government the withheld employment taxes; and he was the sole person responsible for making decisions to pay over those withheld taxes. Furthermore, Mr. Witkemper paid other creditors while the unpaid employment tax obligations of Maximum Spindle continued to accrue. Moreover, as noted, Mr. Witkemper does not contest and in fact concedes that he was a "responsible person."

25. Therefore, the Court finds that Mr. Witkemper was a "responsible person," within the meaning of § 6672, at Maximum Spindle.

### 3. Mr. Witkemper's Behavior Was Willful

26. The Seventh Circuit has "defined the term 'willful' in the context of [§] 6672 to mean 'voluntary, conscious and intentional—as opposed to accidental—decisions not to remit funds properly withheld to the Government.'" *Jefferson*, 546 F.3d at 481 (quoting *Domanus v. United States*, 961 F.2d 1323, 1324 (7th Cir. 1992)).

27. "Any person who is 'responsible' within the meaning of Section 6672 throughout the period in which withheld taxes are not remitted to the Government acts willfully if, when or after he or she gains actual knowledge that the taxes are delinquent, liquid funds are available from which the taxes can be paid and he or she, having the ability to pay the taxes, fails to do so." *Peterson v. United States*, 758 F. Supp. 1209, 1216 (N.D. Ill. 1990) (citing *Garsky v. United States*, 600 F.2d 86, 91 (7th Cir. 1979)).

28. For instance, in the event that "a responsible person learns that withholding taxes have gone unpaid in past quarters for which he was responsible, he has a duty to use all current and future unencumbered funds available to the corporation to pay back those taxes. . . . If the taxpayer thereafter knowingly permits payments of corporate funds to be made to other creditors, a finding of willfulness is appropriate." *Johnson v. United States*, 734 F.3d 352, 364 (4th Cir. 2013).

29. Here, Mr. Witkemper testified that he became aware of Maximum Spindle's unpaid employment taxes in August of 2005.  Subsequently, Mr. Witkemper

paid other creditors while the unpaid employment tax obligations of Maximum Spindle continued to accrue from 2005 through 2006.  During this period, he also paid employees.  *See Hochstein v. United States*, 900 F.2d 543, 548 (2d Cir. 1990) ("For purposes of determining willfulness, an employee to whom the corporate employer owes wages is simply another creditor.").  He showed a preference to other creditors over paying the employment taxes owed to the Government.

30. The Court finds that Mr. Witkemper acted "willfully" by failing to withhold trust fund taxes owed to the Government from the wages of Maximum Spindle's employees from 2005 through 2006.

### 4. The Government Timely Brought Suit

31. Mr. Witkemper failed to meet his burdens of production and persuasion to disprove his status as a responsible person who willfully failed to collect, account for, or pay over the taxes.  But, Mr. Witkemper first cursorily implies that the Government was barred from bringing this suit for failure to assess the tax within three years after the filing of the subject return, apparently relying on the assertion that the certified IRS Form 4340 transcripts do not establish the assessment was made on February 18, 2008.  Having already rejected this contention above, and the instant argument thereby, the Court need not address the applicability of any exceptions to this statute of limitations under 26 U.S.C. § 6501(c) or whether tax collection statutes of limitations are strictly construed in favor of the government, *see Alt. Land & Improvement Co. v. United States*,

790 F.2d, 853, 858 (11th Cir. 1986), but instead turns to Mr. Witkemper's affirmative defense that the Government's suit is barred because it failed to bring this action within ten years of the assessment of taxes.

32. Section 6502 of the IRC provides that taxes may be collected via court proceeding provided the proceeding is initiated within ten years of the assessment of the taxes.  26 U.S.C. § 6502(a)(1).

33. The running of the § 6502 statute of limitations as a bar to suit is an affirmative defense.  *See United States v. Adent*, 821 F.3d 911, 914 (7th Cir. 2016).

34. Certain circumstances toll the running of the statute of limitations established by § 6502.  *E.g.*, 26 U.S.C. § 6331(i)(5).

35. For example, the ten-year collection statute is tolled during the period that an OIC is pending with the IRS.  26 U.S.C. §§ 6331(i)(3)–(5), (k)(1)(A), (k)(3).

36. Moreover, if the IRS rejects an OIC, the statute is tolled for an additional thirty days following the rejection.  *See id.* §§ 6331(i)(5), (k)(3).

37. Section 7122 authorizes the Secretary to accept to compromise a taxpayer's debt under certain prescribed circumstances.  *Id.* § 7122.

38. Section 6331(k)(1) of the IRC generally prohibits the IRS from making a levy on a taxpayer's property or rights to property while an OIC is pending with it.  *Id.* § 6331(k)(1); Rev. Proc. 2003-71 § 5.01.

39. The IRS is also prohibited from making such levy for thirty days after the rejection of an OIC, or while an appeal of a rejection is pending.  26 U.S.C. § 6331(k)(1)(B); Rev. Proc. 2003-71 § 5.01.

40. An OIC must "be made in writing, must be signed by the taxpayer under penalty of perjury, and must contain all of the information prescribed or requested by the Secretary."  26 C.F.R. § 301.7122-1(d)(1).

41. An OIC must also be made on IRS Form 656, and none of the form's standard terms may be stricken or altered.  Rev. Proc. 2003-71 § 4.01.

42. An OIC is accepted for processing "when [the IRS] determines that: the offer is submitted on the proper version of Form 656 and Form 433-A or B, as appropriate; the taxpayer is not in bankruptcy; the taxpayer has complied with all filing and payment requirements listed in the instructions to Form 656; the taxpayer has enclosed the application fee, if required; and the offer meets any other minimum requirements established by the IRS."  Rev. Proc. 2003-71 § 5.01.

43. "[A]n offer is pending beginning on the date the Secretary accepts such offer for processing."  26 U.S.C. § 6331(k)(1)(B); *see also* 26 C.F.R. § 301.7122-1(d)(2).

44. "A determination is made to accept an offer to compromise for processing when a Service official with delegated authority to accept an offer for processing signs the Form 656."  26 U.S.C. § 5.02.

45. "The date the Service official signs the Form 656 is recorded on the Service's computers."  *Id.*

46. However, if an OIC is "never accepted for processing, it was never pending and levy was never prohibited."  *Id.* § 5.03.

33

47. The Court finds that Mr. Witkemper's OIC was processed on August 5, 2008, the date that an authorized IRS official signed the OIC Form 656.[4]  (*See also* Form 4340, Ex. 8 at 25, 29, 33 (stating "08-05-2008 Processable OIC Pending"); Ex. 45 at 8, 12, 17, 25, 31; Ex. 53 at 2, 4, 7, 9.)

48. Furthermore, on August 4, 2008, the IRS received an application fee payment of $150 from Mr. Witkemper.

49. Mr. Witkemper also made a first installment payment of $500.

50. And, the IRS did not issue a notice of intent to levy during the period in which Mr. Witkemper's OIC was pending.

51. Indeed, consistent with 26 U.S.C § 6331(k)(1), the IRS issued a notice of intent to levy on March 16, 2009, after Mr. Witkemper's OIC was withdrawn.

52. Therefore, while Mr. Witkemper's OIC was pending, the period for collection was suspended.

53. Accordingly, the Government commenced this action within the collection period provided by law.

---

[4] Mr. Witkemper's argument that he never made an OIC because his Form 656 lacked "all of the information prescribed or requested by the Secretary," 26 C.F.R. § 301.7122-1(d)(1), is unavailing.  The issue is not whether the OIC was accepted, but, rather, whether the OIC was "pending."  While it is true that Mr. Witkemper did not provide all of the required information on his first Form 656, as evident by the IRS's letter to him to provide additional documentation before the IRS could "complete [its] evaluation," (IRS Letter, Ex. 11 at 12), Mr. Witkemper's OIC was accepted for processing as soon as the IRS official signed his OIC on August 5, 2008.  *Cf.* Rev. Proc. 2003-71 § 5.04  ("If an offer to compromise accepted for processing does not contain sufficient information to permit the Service to evaluate whether the offer should be accepted, the Service will *request* that the taxpayer provide the needed *additional information*.") (emphasis added).  Therefore, Mr. Witkemper's argument that he made an "impossible offer" because he added verbiage in pen to the "Section IV Offer Compromise Terms" portion of the form is also unavailing, because the IRS did not return his OIC, but rather sought more information from him.  *See id.* ("The Service may [] return the offer after it has been accepted for processing if . . . the offer was accepted for processing in error.").

## B. The Residential Property

54. If a person liable to pay any tax neglects or refuses to pay the same after notice and demand, the amount shall be a lien in favor of the United States upon all property and rights to property belonging to such person. *See* 26 U.S.C. § 6321.

55. "A federal tax lien attaches to 'all property and rights to property, whether real or personal,' of a federal taxpayer." *United States v. Swan*, 467 F.3d 655, 656 (7th Cir. 2006) (quoting 26 U.S.C. § 6321)).

56. "State law determines what property rights the taxpayer has. *Id.* (citing *Drye v. United States*, 528 U.S. 49, 58 (1999)).

57. "Federal law determines whether those rights are the sort of rights to which a lien attaches." *Id.* (citing *United States v. Craft*, 535 U.S. 274, 278–79 (2002)).

58. "The primary consideration is 'the breadth of control' the taxpayer could exercise over the property." *United States v. Kollintzas*, 501 F.3d 796, 803 (7th Cir. 2007) (quoting *Drye*, 528 U.S. at 61.

59. "The lien attaches not only to property owned by the taxpayer on the date of assessment, but also to property acquired at any time after assessment." *United States v. Sanders*, No. 11-cv-912, 2016 WL 6124932, at *9 (S.D. Ill. Oct. 20, 2016) (citing *Glass City Bank v. United States*, 326 U.S. 265, 267 (1945)), *aff'd*, 676 F. App'x 599 (7th Cir. 2017).

60. The lien arises on the date the tax liability is assessed by the IRS. 26 U.S.C. § 6322.

*1. The Government's Federal Tax Liens Attached to the Residential Property*

61. Federal tax liens arose against Mr. Witkemper on February 18, 2008, the date his TFRP liabilities for the unpaid employment taxes of Maximum Spindle were assessed.

62. Mr. Witkemper has exercised control over the Residential Property since he and Mrs. Witkemper acquired it in 1984. Indeed, even during the purported transfers in this case, Mr. and Mrs. Witkemper have resided in the Residential Property as their primary residence and have been responsible for all maintenance, upkeep, property taxes, liability insurance, and other expenses associated with the property.

63. Therefore, the Court finds that the tax liens attached to the tenancy by entireties interest he held in the Residential Property on February 8, 2008.

64. The Court also finds that the IRS duly filed, and then re-filed, notices of federal tax lien with the Bartholomew Recorder for these assessed liabilities.

65. "Once a lien has attached to an interest in property, the lien cannot be extinguished . . . simply by a transfer or conveyance of the interest." *United States v. Rodgers*, 461 U.S. 677, 691 n.16 (1983).

66. Thus, through the purported transfers, the federal tax liens followed Mr. Witkemper's interest in the Residential Property, and those tax liens attached to Mr. Witkemper's present one-half interest in the Residential Property held in joint tenancy with the right of survivorship with Mrs. Witkemper.

*2. The Government's Enforcement of Its Federal Tax Liens*

67. "Section 7403 of the [IRC] allows the government to file a civil suit to enforce its lien(s) and recover payment in any case where taxes have not been paid." *Adent*, 821 F.3d at 914 (quoting 26 U.S.C. § 7403(a)).

68. In doing so, the Government "may seek to 'subject *any property,* [of] whatever nature, of the delinquent, or *in which he has any right, title, or interest,* to the payment of such tax or liability.'" *United States v. Rodgers*, 461 U.S. 677, 692 (1983) (citing 26 U.S.C. § 7403(a)) (emphasis in original).

69. "All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto." 26 U.S.C. § 7403(b).

70. "The court . . . in all cases where a claim or interest of the United States therein is established may decree a sale of such property . . . and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States." *Id.* § 7403(c).

71. "[T]he plain language of § 7403 contemplates the sale of the entire property, including innocent third-party interests in that property, and that the Supremacy Clause precludes protection of innocent third-party interests via state law." *Adent*, 821 F.3d at 915 (citing *Rogers*, 461 U.S. at 693–94, 703–04).

72. However, "§ 7403 protects an innocent third party's interest by providing for distribution of the proceeds from the court-ordered sale to the innocent third party to compensate them for their interest." *Id.* (citing *Rogers*, 461 U.S. at 693–94, 703–04).

73.  "The district court's 'limited discretion' under § 7403 is to be 'exercised rigorously and sparingly, keeping in mind the Government's paramount interest in prompt and certain collection of delinquent taxes.'"  *Id.* (quoting *Rodgers*, 461 U.S. at 711).

74.  "The lien that arises after a taxpayer fails to pay an assessed tax liability attaches not only to property belonging to the taxpayer, but also to property held by the taxpayer's nominees—someone who has legal title when, in substance, the taxpayer enjoys the benefits of ownership."  *United States v. Wesselman*, 406 F. App'x 64, 65 (7th Cir. 2010) (citing *Swan*, 467 F.3d at 658).

75.  Pursuant to Section 7403, the Court finds that the Government is entitled to enforce its federal tax liens against Mr. Witkemper's interest in the Residential Property.

76.  Further, the Government is authorized to sell the Residential Property and is entitled to fifty percent of the proceeds from Mr. Witkemper's one-half interest in the Residential Property.

### C. THE COMMERCIAL PROPERTY

#### *1. The Transfer Was Voidable*

77.   The Indiana Uniform Fraudulent Transfer Act ("IUFTA") provides that a creditor can obtain a judgment against the first transferee of an asset to the extent the subject transfer is avoidable.  Ind. Code § 32-18-2-18(b)(1)(A).

78.  Under the IUFTA, an "asset" is "property of the debtor" and "property" is "anything that may be the subject of ownership."  *Id.* § 32-18-2-2(1), (10); *see*

*also* 37 Am. Jr. 2d *Fraudulent Conveyances and Transfers* § 71 (May 2020) ("[U]nder the Uniform Fraudulent Transfer Act . . . the term 'assets' . . . comprehends any property which is in the debtor's name or the title to which would be vested in the debtor if a fraudulent conveyance were to be set aside.").

79. The Court finds that the Commercial Property, located at 1141 S. Walnut Street, Edinburgh, IN 46124, was an asset of Mr. Witkemper within the meaning of the IUFTA.

80. Moreover, under the IUFTA, a "transfer" comprehends "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, or disposing of or parting with an asset or an interest in an asset . . . ." Ind. Code § 32-18-2-2(13).

81. Therefore, an argument that the debtor does not technically own the transferred asset under the IUFTA is unavailing, because "fraudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form." *Cont'l Cas. Co. v. Symons*, 817 F.3d 979, 993 (7th Cir. 2016) (quoting *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) (quotation marks omitted)).

82. It is undisputed, that in 2013, Mr. Witkemper caused Witkemper Properties to transfer the Commercial Property by quitclaim deed to Mrs. Witkemper, within the meaning of the IUFTA.

83. For the following reasons, the Court finds that the transfer of the Commercial Property from Witkemper Properties to Mrs. Witkemper is voidable under the

IUFTA because the transfer was both constructively fraudulent and actually fraudulent.

*a. The Transfer Was Constructively Fraudulent*

84. Under the IUFTA, when a creditor's claim arose prior to a transfer, such transfer is voidable if "(1) the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation; and (2) the debtor was insolvent at that time [ ] *or* became insolvent as a result of the transfer or obligation."  Ind. Code §§ 32-18-2-15(a)(1)–(2) (emphasis added).

85. A creditor making a claim for relief under § 32-18-2-15 "has the burden of proving the elements of the claim for relief by a preponderance of the evidence." *Id.* § 32-18-2-15(b); *see also Hernandez-Velazquez v. Hernandez*, 136 N.E.3d 1130, 1137 (Ind. Ct. App. 2019).

86. Here, the Government's claim arose prior to the 2013 transfer of the Commercial Property; it arose in 2008 when the TFRP penalties for the unpaid tax liabilities of Maximum Spindle were assessed.

87. "Value is given for a transfer . . . if, in exchange for the transfer . . . property is transferred or an antecedent debt is secured or satisfied."  Ind. Code § 32-18-2-13(a).

88. In 2013, Mr. Witkemper transferred the Commercial Property to Mrs. Witkemper for no consideration, and therefore the Court finds that, under the IUFTA, no reasonably equivalent value was given for the transfer of the Commercial Property.  *Cf. Ind. Law. Encyc. Fraudulent Conveyances* § 15 (Sept. 2020)

("Lack of consideration alone is not enough to support a charge of fraudulent transfer. However, if the lack of consideration is coupled with insolvency, then the transfer is fraudulent.").

89. "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Ind. Code § 32-18-2-12(c).

90. However, if a debtor is generally not paying his debts as they become due, other than as a result of a bona fide dispute, he is presumed to be insolvent, and the presumption imposes on the debtor the burden of proving the that "the nonexistence of insolvency is more probable than its existence." *Id.* § 32-18-2-12(d).

91. The Court also finds that Mr. Witkemper is presumed to be insolvent, under the IUFTA, because at the time of the transfer he was "generally not paying his debts as they became due." *Id.* § 32-18-2-12(d). For instance, he failed to pay real property taxes on the Commercial Property during the 2008 tax year and he failed to make mortgage payments on the S. Mapleton Property.

92. But even if Mr. Witkemper was not presumed to be insolvent, he was rendered insolvent by the transfer of the Commercial Property.

93. This is so because the sum of Mr. Witkemper's debts at the time of the transfer, which included his TFRP liabilities; the mortgages of the Residential, Commercial, and S. Mapleton Properties; and the impending judgment in favor of A&B against him, exceeded $1.5 million; his remaining assets were negligible compared to these debts.

41

94. Consequently, Mr. Witkemper has failed to meet his burden in providing that "the nonexistence of insolvency is more probable than its existence."  Ind. Code § 32-18-2-12(d).

95. In sum, Mr. Witkemper's transfer of the Commercial Property was constructively fraudulent to the Government and is voidable.

### b. The Transfer Was Actually Fraudulent

96. Even if the transfer was not constructively fraudulent, the transfer was actually fraudulent and, therefore, voidable.  *Cf. Com. Credit Counseling Servs., Inc. v. W.W. Grainger, Inc.*, 840 N.E.2d 843, 852 (Ind. Ct. App. 2006) ("Because Indiana Code section 32–18–2–14 is disjunctive, actual intent to hinder or delay a creditor is enough to render a transfer fraudulent.").

97. A transfer by a debtor is voidable under the IUFTA, whether a creditor's claim arose before or after the transfer, if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor."  Ind. Code § 32-18-2-14(a)(1).

98. "In fraudulent-transfer cases under § 14, Indiana courts consult a list of factors known as the 'badges of fraud' to determine whether the transfer was made with intent to defraud a creditor."  *Cont'l Cas. Co.*, 817 F.3d at 988 (citing *Otte v. Otte*, 655 N.E.2d 76, 81 (Ind. Ct. App. 1995)).

99. Indiana has codified these badges of fraud; under the IUFTA, the Court may consider, among other factors, whether:

> (1) the debtor retained possession or control of the property transferred after the transfer;

42

(2)  the transfer or obligation was disclosed or concealed;

(3)  before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(4)  the transfer was of substantially all the debtor's assets;

(5)  the debtor absconded;

(6)  the debtor removed or concealed assets;

(7)  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(8)  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;  and

(9)  the transfer occurred shortly before or shortly after a substantial debt was incurred.

Ind. Code § 32-18-2-14(b).

100.  "As no single indicium constitutes a showing of fraudulent intent per se, the facts must be taken together to determine how many badges of fraud exist and if together they amount to a pattern of fraudulent intent."  *Hernandez-Velazquez*, 136 N.E.3d at 1138; *see also Hoesman v. Sheffler*, 886 N.E.2d 622, 630 (Ind. Ct. App. 2008) ("The existence of several of these badges may warrant an inference of fraudulent intent, but no particular badge constitutes fraudulent intent per se.").

101.  Here, the Court finds fraudulent intent based on the following factors:

a.  Badge 1: Mr. Witkemper retained control over the Commercial Property after the transfer.

b.  Badge 3: A&B sued Mr. Witkemper and Witkemper Properties to foreclose on the S. Mapleton Property only a few months before Mr. Witkemper caused Witkemper Properties to transfer the Commercial Property to Mrs. Witkemper.

43

c.  Badge 6: Mr. Witkemper engaged in a pattern of behavior from 2013 through 2014 to get assets out of his name and make himself judgment proof against creditors, including the Government.  Although he testified that he had no intention of defrauding, cheating, or hiding assets from the IRS, that his cooperation with the IRS over the years in fact obviated any finding of intent to defraud, and that the transfers were part of estate planning on advice of his former attorney, he also testified that he transferred the property to Mrs. Witkemper to get it out of his hands.

d.  Badge 7: Mr. Witkemper transferred the Commercial Property to Mrs. Witkemper without consideration, which was not reasonably equivalent to the value of the asset transferred.

e.  Badge 8: Mr. Witkemper was rendered insolvent by the transfer of the Commercial Property.

f.  Badge 9: A few months after the purported transfer, a court entered a judgment and decree of foreclosure in favor of A&B and against Witkemper Properties and Mr. Witkemper, jointly and severally, in the amount of $575,051.62.

102. Therefore, considering these facts, the Court finds that Mr. Witkemper's Commercial Property was transferred with "actual intent to hinder, delay, or defraud," in violation of the IUFTA, Ind. Code § 14(a)(1).  Thus, Mr. Witkemper's

transfer of the Commercial Property was actually fraudulent to the Government and is voidable.

*2. Alternatively, the Federal Tax Liens Attached to the Commercial Property and the Proceeds Realized from its Sale*

103. Even if the transfer of the Commercial Property from Witkemper Properties to Mrs. Witkemper is not voidable under the IUFTA, the federal tax liens that arose because of Mr. Witkemper's TFRP liabilities for the unpaid employment taxes of Maximum Spindle attached to the Commercial Property and the proceeds realized from its sale.

104. That is, the Government's federal tax liens attached to Mr. Witkemper's undivided interest in Witkemper Properties and the tax liens attached to the property held by Witkemper Properties because Witkemper Properties held title to the Commercial Property as Mr. Witkemper's alter ego, or, alternatively, because both Witkemper Properties and Mrs. Witkemper held title to the Commercial Property as Mr. Witkemper's nominees.

*a. Witkemper Properties Held Title to the Commercial Property as Mr. Witkemper's Alter Ego*

105. Federal tax liens attach to property held by the taxpayer's alter ego. *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 351 (1977); *see also Swan*, 467 F.3d at 658.

106. "Indiana courts are reluctant to disregard corporate identity and do so only to protect third parties from fraud or injustice when transacting business with a

corporate entity." *Brant v. Krilich*, 835 N.E.2d 582, 589 (Ind. Ct. App. 2005) (citing *Lambert v. Farmers Bank*, 519 N.E.2d 745, 747 (Ind. Ct. App. 1988)).

107. Moreover, "the separate existence of a corporation may be disregarded to prevent injustice when a third party transacts business with an individual who fraudulently uses a corporation as a shield from liability." *Id.* (citing *Lambert*, 519 N.E.2d at 747).

108. "In order to disregard the corporation's separate existence under the alter ego theory, the third party must show both ownership and control of the corporation by the shareholder." *Lambert*, 519 N.E.2d at 747 (citing *Hinds v. McNair*, 129 N.E.2d 553, 566 (Ind. 1955)).

109. Here, it is undisputed that Mr. Witkemper had ownership and control of Witkemper Properties at least because he was the sole member of the LLC.

110. The factual analysis required to determine whether an individual operates as an alter ego of a corporate entity is essentially "analogous to that used to pierce the corporate veil." *Brant*, 835 N.E.2d at 590.

111. A court in Indiana will disregard [a] corporate identity and pierce the corporate veil only if the party attacking the corporation can establish that the 'corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice.'" *Cmedia Servs., LLC v. Rogers*, No. 1:15-cv-435, 2015 WL 5022167, at *23 (S.D. Ind. July 31, 2015) (quoting *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994)).

112. A limited liability company may also have its protections pierced.  *See Longhi v. Mazoni*, 914 N.E.2d 834, 839 (Ind. Ct. App. 2009); *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 504 (Ind. Ct. App. 2007); *see also CBR Event Decorators, Inc. v. Gates*, 962 N.E.2d 1276, 1281–82 (Ind. Ct. App. 2012) ("[C]ourts will not provide the protection of limited liability to an entity that is a mere instrumentality of another and engages in misconduct in the function or use of the corporate form.").

113. "When a court exercises its equitable power to pierce a corporate veil, it engages in a highly fact-sensitive inquiry."  *Oliver v. Pinnacle Homes, Inc.*, 769 N.E.2d 1188, 1191 (Ind. Ct. App. 2002).

114. "The party seeking to pierce the corporate veil bears the burden of proof." *Ziese & Sons Excavating, Inc. v. Boyer Const. Corp.*, 965 N.E.2d 713, 720 (Ind. Ct. App. 2012).

115. In determining whether the party seeking to pierce the veil has met its burden, Indiana courts consider the following *Aronson* factors:

> (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; and (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Id.*

116. "All factors need not be present in order to support a decision to pierce the corporate veil." *D.S.I. v. Natare Corp.*, 742 N.E.2d 15, 27 (Ind. Ct. App. 2000).

117. Here, the Government has met its burden in showing that piercing Witkemper Properties is warranted, and that Witkemper Properties held title to the Commercial Property as Mr. Witkemper's alter ego.

118. Mr. Witkemper maintained few if any corporate records for Witkemper Properties, other than perhaps the articles of organization on file with the Indiana Secretary of State.

119. Moreover, Mr. Witkemper commingled his own assets and Witkemper Properties's assets to the point where they were indistinguishable. He testified that he did not have a personal bank account from 2009 to 2014; that he used the Account as his personal account during that period, including, for example, for purchases at restaurants such as O'Charleys and Applebee's, and for different golf trips or vacations; that he deposited checks written out personally to him into the Account; and that he used the Account to pay individual obligations. Also, the rental payments from the S. Mapleton and Commercial Properties were Witkemper Properties's only revenue stream.

120. Furthermore, Witkemper Properties did not observe corporate formalities, as evident by it failing to file its first and only business entity report with the Indiana Secretary of State. Accordingly, on July 7, 2009, the Indiana Secretary of State administratively dissolved Witkemper Properties, and Mr. Witkemper's later attempt to have Witkemper Properties reinstated failed.

121. Subsequently, against "corporate formalities," Mr. Witkemper continued to operate Witkemper Properties as if it had not been dissolved, contrary to Indiana

Law.  *See* Ind. Code § 23-18-9-3(a) ("A dissolved limited liability company *may only* carry on business that is *appropriate to wind up and liquidate* its business and affairs[.]") (emphasis added).  For example, he did not notify creditors of the dissolution, and, although a dissolved LLC may distribute its "remaining property among the members," *id.* § 23-18-9-3(a)(4), Mr. Witkemper was the sole member of Witkemper Properties, and rather than distributing the remaining property, he inappropriately continued to lease the Commercial Property, deposit rent checks into the Account, and transfer the Commercial Property to Mrs. Witkemper for no consideration.

122. After its fact-sensitive inquiry, the Court finds that Mr. Witkemper used Witkemper Properties as a mere instrumentality to hold his assets and, therefore, operated it as his alter ego.  Thus, the Government's federal tax liens attached to the Commercial Property.

### b. Mr. Witkemper's Nominees

123. But even if Mr. Witkemper did not operate Witkemper Properties as his alter ego, the Government's federal tax liens attached to Mr. Witkemper's undivided interest in Witkemper Properties and the tax liens attached to the property held by Witkemper Properties because both Witkemper Properties and Mrs. Witkemper held title to the Commercial Property as Mr. Witkemper's nominees.

124. "The lien that arises after a taxpayer fails to pay an assessed tax liability attaches not only to property belonging to the taxpayer, but also to property held

by the taxpayer's nominees . . . ." *United States v. Wesselman*, 406 F. App'x 64, 65 (7th Cir. 2010) (citing *G.M. Leasing Corp.*, 429 U.S. at 350–51).

125. A "nominee" is one who holds bare legal title to the property for the benefit of another. *Black's Law Dictionary* (11th ed. 2019).

126. "[T]he central inquiry of the nominee doctrine is 'whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true owner-ship.'" *United States v. N. States Invs., Inc.*, 670 F. Supp. 2d 778, 789 (N.D. Ill. 2009); *c.f. Swan*, 467 F.3d at 658 ("Suppose a person who wants to evade taxes parks his property with a friend or family member.  That would be a fraudulent conveyance, and so the person to whom the property was conveyed would be deemed the taxpayer's 'nominee' and forced to cough it up.").

127. In determining whether property is held by a taxpayer's nominee, courts con-sider the following factors:

> (1) no consideration or inadequate consideration paid by the nom-inee; (2) property placed in the name of the nominee in anticipa-tion of a suit or occurrence of liabilities while the transferor con-tinues to exercise control over the property; (3) close relationship between transferor and the nominee; (4) failure to record convey-ance; (5) retention of possession by the transferor; and (6) contin-ued enjoyment by the transferor of benefits of the transferred property.

*Barmes v. IRS*, No. TH 97-287-C-T/F, 2004 WL 1005493, at *10 (S.D. Ind. Mar. 29, 2004).  These factors are in many respects akin to the badges already ana-lyzed under the IUFTA, thus leading to the same result,

128. Three of the six factors are present with respect to Witkemper Properties.

g. Factor 3: Mr. Witkemper and Witkemper Properties had a close relationship: Mr. Witkemper was the sole member and manager of Witkemper Properties.

h. Factor 5: Mr. Witkemper testified that he, at all times, exercised dominion and control of the Commercial Property.

i. Factor 6: Mr. Witkemper directed and controlled the Witkemper Properties account and used it as his own personal bank account. He signed all the checks it issued; he frequently utilized the Account for personal expenditures; and frequently deposited checks made out to him personally into the LLC account. Mr. Witkemper also reported the rental income and expenses from the Commercial Property on his personal income tax return from 2009 through 2013.

129. The Court therefore finds that Witkemper Properties held title to the Commercial Property as Mr. Witkemper's nominee.

130. Also, five of the six factors are present with respect to Mrs. Witkemper.

j. Factor 1: Mr. Witkemper transferred the Commercial Property to Mrs. Witkemper for no consideration.

k. Factor 2: Mrs. Witkemper received the Commercial Property as Witkemper Properties and Mr. Witkemper were being sued by A&B to foreclose on the S. Mapleton Property, which was also titled in Witkemper Properties's name.

l. Factor 3: Mrs. Witkemper is Mr. Witkemper's wife and thus had a close relationship with him.

m. Factor 5: Despite Mrs. Witkemper holding legal title to the Commercial Property, Mr. Witkemper continued to deposit rental checks from the lease agreement with another commercial property into the Account.

n. Factor 6: Mr. Witkemper had access to and utilized the proceeds of the sale of the Commercial Property despite never having held legal title to it.

131. The Court therefore also finds that Mrs. Witkemper held title to the Commercial Property as Mr. Witkemper's nominee.

132. Thus, the Government's federal tax liens attached to the Commercial Property while it was held by Witkemper Properties and Mrs. Witkemper as nominees of Mr. Witkemper.

D. THE GOVERNMENT IS ENTITLED TO A JUDGMENT AGAINST MRS. WITKEMPER

133. If the transfer of the Commercial Property between Mr. and Mrs. Witkemper had not been fraudulent—for example, if she had been a good-faith purchaser for consideration and without notice of the liabilities, which she was not—Mr. Witkemper would have received the net proceeds that Mrs. Witkemper received from the sale of the Commercial Property.  But, because Mr. Witkemper fraudulently transferred the Commercial Property to Mrs. Witkemper, she is liable, under the IUFTA, for the proceeds she received, $202,931.01, from the sale of the Commercial Property.

134. She would also be the liable for the proceeds even if the transfer was not fraud-
     ulent.  This is because the Government would still be entitled to the proceeds
     because Witkemper Properties held title to the Commercial Property as Mr.
     Witkemper's alter ego, and the federal tax liens against Mr. Witkemper there-
     fore attached to the Commercial Property.

135. Alternatively, the same is true under the nominee theory because the Govern-
     ment's federal tax liens attached to the Commercial Property while it was held
     by Witkemper Properties and Mrs. Witkemper as nominees of Mr. Witkemper.

136. Under either theory the Government is entitled to judgment against Mrs. Wit-
     kemper for $202,931.01.

137. When the Commercial Property was transferred to Mrs. Witkemper in January
     of 2013 for no consideration, Mrs. Witkemper was aware of Mr. Witkemper's
     federal tax liabilities.  Consequently, Mrs. Witkemper was not a "purchaser"
     as defined by the IRC.  *See* 26 U.S.C. § 6323(h)(6) (The IRC defines a purchaser
     as a "person who, for adequate and *full consideration in money* or money's
     worth, acquires an interest . . . in property which is valid under local law
     against subsequent purchasers *without actual notice*." (emphases added)).

138. She therefore took the Commercial Property subject to the Government's liens.
     *Cf. Phelps v. United States*, 421 U.S. 330, 334–35 (1975) (holding third-party
     assignee who did not fall within one of the enumerated exceptions under § 6323
     took transferred property subject to tax lien).  Purchasers, holders of a security

interest, mechanic's lienors, or judgment lien creditors fall under the exceptions.  *See* 26 U.S.C. § 6323.

139. Moreover, when Blair Holdings LLC purchased the Commercial Property in 2014, Blair Holdings LLC did not have notice of the federal tax liens attached to the Commercial Property.  This is because Mr. Witkemper concealed the Commercial Property from the Government by holding it in the name of Witkemper Properties, which impeded the recorded NFTLs from putting good faith purchasers on notice of the federal tax liens.

140. In this situation, the liens attached to the proceeds of the sale by the transferee.  *See Mun. Trust & Bank Sav. v. United States*, 114 F.3d 99, 101 (7th Cir. 1997) ("[I]t was established long ago that the lien follows any property substituted for what the taxpayer owned, provided that the chain of substitution can be traced."); *see also Phelps*, 421 U.S. at 334–35 (citing *Sheppard v. Taylor*, 30 U.S. 675, 710–11 (1831)) ("[T]he lien reattaches to the thing and to whatever is substituted for it . . . . The owner and the lien holder whose claims have been wrongfully displaced, may follow the proceeds wherever they can distinctly trace them.").

141. The proceeds from the sale of the Commercial Property to Blair Holdings LLC are distinctly traceable to Mrs. Witkemper—Mr. and Mrs. Witkemper reported the net proceeds of $202,931.01 from the sale of the Commercial Property on their joint 2014 federal income tax return and Mrs. Witkemper deposited the $202,931.01 into the Centra Checking Account.

142. Thus, because the proceeds of the sale are distinctly traceable to Mrs. Witkem-

per, the Government is entitled to the cash proceeds from the sale of the Com-

mercial Property.

## IV. Conclusion

For the foregoing reasons:

With respect to Count I, Defendant Richard E. Witkemper is liable to Plaintiff

United States of America, in the amount of $385,705.54, plus interest and other stat-

utory additions, for his unpaid trust fund recovery penalty liabilities associated with

Maximum Spindle Utilization Inc., for the periods ending June 30, 2005; December

31, 2005; March 31, 2006; June 30, 2006; and September 30, 2006.

With respect to Count II, Plaintiff United States of America has valid and subsist-

ing federal tax liens on all property and rights to property belonging to Defendant

Richard E. Witkemper for the unpaid trust fund recovery penalty liabilities assessed

against him associated with Maximum Spindle Utilization, Inc. and Plaintiff United

States of America may enforce its federal tax liens attached to the residential prop-

erty located at 4532 29th Street, Columbus, Indiana 47203.

With respect to Count III, Defendant Ellen F. Witkemper is liable to Defendant

United States of America for the net proceeds of the sale of the property located at

1141 South Walnut Street, Edinburgh, Indiana, in the amount of $202,931.01.

Judgment will issue under separate order.

**SO ORDERED.**

Date: 3/31/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana


Distribution:

Angela R. Foster
U.S. DEPARTMENT OF JUSTICE - TAX DIVISION (Washington DC)
angela.r.foster@usdoj.gov

W. Brent Gill
SMITH LAW SERVICES PC
wbrentgill@comcast.net

Samuel Patrick Jones
U.S. DEPARTMENT OF JUSTICE, TAX DIVISION
samuel.p.jones@usdoj.gov

Jason M. Smith
SMITH LAW SERVICES, P.C.
jason.smith@smithlawservices.com